**DYNAMET TECHNOLOGY, INC., Assignee, by mesne assignment, of Dynamet Corporation, Plaintiff-Appellant,**

v.

**DYNAMET INCORPORATED, Defendant-Appellee.**

**Appeal No. 78–551.**

United States Court of Customs and Patent Appeals.

March 8, 1979.

David Wolf, Boston, Mass. (Wolf, Greenfield & Sacks, P. C., Boston, Mass.) attorney of record, for appellant.

William H. Logsdon, Pittsburgh, Pa., attorney of record, for appellee, Webb, Burden, Robinson & Webb, P. A., Pittsburgh, Pa., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN, and MILLER, Judges, and FORD,* Judge.

\* The Honorable Morgan Ford, United States Customs Court, sitting by designation.

1.  197 USPQ 702 (1977).

2.  Section 16 of the Lanham Act, 15 U.S.C. § 1066, provides:

> *§ 1066. Interference; declaration by Commissioner*
>
> Whenever application is made for the registration of a mark which so resembles a mark previously registered by another, or for the registration of which another has previously made application, as to be likely when applied to the goods or when used in connection with the services of the applicant to cause confusion or mistake or to deceive, the Commissioner may declare that an interference exists. No interference shall be declared between an application and the registration of a mark the right to the use of which has become incontestable.

Trademark interferences originating after March 1, 1972, the effective date of Rule 2.91(a) of the Trademark Rules of Practice, 37 CFR 2.91(a), are somewhat rare. The new rule provides:

> *§ 2.91 Interferences.*

MILLER, Judge.

Dynamet Technology, Inc. ("plaintiff"), appeals from the decision of the Patent and Trademark Office Trademark Trial and Appeal Board ("TTAB"),[1] awarding priority to Dynamet Incorporated ("defendant") in a trademark interference proceeding (No. 6,866)[2] declared January 21, 1971, involving plaintiff's application[3] to register DYNAMET for sintered titanium metal and defendant's application[4] to register DYNAMET for specialty metal products, namely: titanium rod and wire and nickel alloys rod and wire. We affirm on the priority issue and remand on the registrability issue.

## Background

Plaintiff, during 1967 and the early months of 1968 (the critical time period involved herein), was engaged in research and development concerning special shapes to be produced from special alloys, and in producing and selling prototype titanium products. Its customers included members of the aircraft industry. The history of plaintiff begins in December of 1967 or January of 1968,[5] when Stanley Abkowitz

> (a) An interference will not be declared between two applications or between an application and a registration except upon petition to the Commissioner. Interferences will be declared by the Commissioner only upon a showing of extraordinary circumstances which would result in a party being unduly prejudiced without an interference. In ordinary circumstances, the availability of an opposition or cancellation proceeding to the party will be deemed to remove any 'undue prejudice.

3.  Serial No. 303,664, filed July 26, 1968, and asserting first use on the goods in commerce at least as early as February 1968.

4.  Serial No. 301,002, filed June 21, 1968, and asserting first use on the goods in commerce on June 12, 1968. Defendant originally claimed June 7, 1968, as its first date of use, but, after trial, moved to change this date to conform to the evidence of use established at trial. The motion was granted in the absence of objections by plaintiff.

5.  Unless otherwise indicated, dates refer to 1968.

(currently plaintiff's president) and John Siergiej formed an informal partnership called "Dynamet" or "Dynamet Company." On January 31, the name "Dynamet Corporation" was registered with the Commonwealth of Massachusetts, and in May "Dynamet Corporation" was incorporated in Massachusetts. Prior to incorporation, business cards were printed in February; on February 25, Abkowitz attended an annual meeting of the American Institute of Metallurgical Engineers ("AIME"), where he chaired a program and was identified as associated with "Dynamet Corporation"; the partnership received supplies of raw titanium on or about February 1 and regularly thereafter; an order directed to "Dynamet" was received on February 13 from the Wyman-Gordon Company for one hundred pounds of processed powdered titanium; on March 12 this order was delivered in a drum on which "DYNAMET" was stenciled along with the company address; and on March 29, a prospectus was prepared which was distributed to potential investors.

Defendant's history begins in August of 1967, when Peter C. Rossin (currently president, chief executive officer, and treasurer of defendant) decided to form a company to manufacture and sell specialty metal products, particularly titanium rod and wire products, to, *inter alia*, the aircraft fastener industry. He prepared a prospectus, which was distributed by mail and personal contact in August or September of 1967 to potential investors. The name "Dynamet" was chosen in October 1967, and on November 13, 1967, defendant was incorporated in Pennsylvania as "Dynamet Incorporated." During its early stages, defendant's headquarters was located at Rossin's home. In December of 1967, Rossin obtained stationery, business cards, checks, and other corporation paraphernalia—all bearing the corporate name; opened a checking account under the corporate name; and arranged for a separate telephone for defendant which was

billed to and paid for by defendant. Equipment necessary for defendant's manufacturing operations was ordered on December 18, 1967,[6] a product price list, dated January 1, 1968, was prepared on defendant's stationery covering the titanium products which defendant intended to supply to its customers; the price list was mailed out or hand-delivered to potential purchasers; and on January 25, F. H. Lenway Co. of San Francisco became defendant's West Coast sales representative. In the following April, premises for defendant's plant were leased, employees were hired, equipment was installed, and raw materials were purchased. Thereafter, titanium and nickel mill products were made and shipped under the DYNAMET name or trademark. Meanwhile, Rossin had been promoting defendant by personally contacting essentially all of the aircraft fastener producers and informing them of defendant's intent to be a supplier of products for their use.[7] One of the earliest contacts was on September 29, 1967, with Robert L. Sproat, a vice president of Standard Pressed Steel Company.

The TTAB found that plaintiff had made open and public use of DYNAMET as part of its trade name since February of 1968, relying for its finding upon plaintiff's solicitation of potential customers for its powdered titanium products and Abkowitz's attendance at the AIME meeting. The TTAB also found that the March 12, 1968, shipment further evidenced "an open and commercial use" of DYNAMET. (197 USPQ at 709.)

With respect to defendant, the TTAB found that, since December of 1967, it had made "open and notorious use" of DYNAMET "in connection with the promotion of its corporate activities through contact with potential customers of its goods in the aircraft fastener field." It particularly relied upon the testimony of potential customer

---

**6.** A letter to shareholders on February 12, 1968, indicates that, as of that time, nearly $89,000 worth of equipment had been ordered.

**7.** The record indicates that the products to be produced by defendant would be directed to a "very narrow segment of the industry" consisting of only a few potential customers.

Sproat and defendant's offering of its products to potential customers in the price list dated January 1, 1968. (197 USPQ at 711.) It found that defendant's first use of DYNAMET in commerce was on a shipment on June 12, 1968, from Pittsburgh to New Jersey of a single titanium rod in a reinforced envelope. The TTAB held that, as between the parties, defendant possessed superior rights in DYNAMET. Accordingly, it refused registration to plaintiff.

Before the TTAB, plaintiff raised the issue of the sufficiency of the June 12, 1968, shipment to entitle defendant to a trademark registration. To this, the TTAB responded (197 USPQ at 712):

> There is no doubt but that plaintiff's comments relative to the June 12, 1968 shipment [see note 4, supra] involve to some extent speculation, surmise, and hearsay; but nevertheless beneath all of this smoke, a serious question remains as to the bona fide character of the shipment that requires clarification before a registration can issue to defendant on the application involved in this proceeding . . . .

The TTAB concluded that determination of the bona fide character of the June 12, 1968, shipment was a task initially for the examiner and that the application should be remanded to the examiner for further action.

## OPINION

There are two questions involved in this appeal: (1) As between plaintiff and defendant, which party has superior rights, i. e., priority of use, in DYNAMET? (2) Is the party having superior rights entitled to a trademark registration for DYNAMET?[8]

■ In a trademark interference proceeding, the time period of a party's trade-name use of a word may be tacked onto its first date of trademark use on goods in interstate commerce for the purpose of establishing priority of trademark use. *Jim Dandy Co. v. Martha White Foods, Inc.*, 458 F.2d 1397, 1400, 59 CCPA 1016, 1019–20, 173 USPQ 673, 675 (1972); *Alfred Electronics v. Alford Manufacturing Co.*, 333 F.2d 912, 51 CCPA 1533, 142 USPQ 168 (1964); see 15 U.S.C. § 1052(d).

■■ It is well established that no property rights in a trademark for goods arise except in connection with its use thereon by an existing business entity.[9] Similarly, it would seem that there can be no property rights in a trade name except in connection with its use with a business entity that has engaged in *sufficient activities* to have acquired goodwill, because a trade name is representative of the goodwill of a business entity.[10] *See American Steel Foundries v. Robertson, supra* 269 U.S. at 380, 46 S.Ct. 160; *In re Walker Process Equipment Inc.*, 233 F.2d 329, 330–31, 43 CCPA 913, 915, 110 USPQ 41, 42 (1956); *Lawyers Title Insurance Co. v. Lawyers Title Insurance Corp.*, 71 App.D.C. 120, 109 F.2d 35 (1939), cert. denied, 309 U.S. 684, 60 S.Ct. 806, 84 L.Ed. 1028 (1940); 15 U.S.C. § 1127. *See also* 1 J. McCarthy, *Trademarks and Unfair Competition* §§ 4:4, 16:4 (1973); E. Vandenburgh, *Trademark Law and Procedure* § 1.21(e) (2d ed. 1968). Accordingly, to establish its right to tack the time period of its trade-name use of a word onto its first date of

---

**8.** Likelihood of confusion if both parties contemporaneously used DYNAMET for their respective goods is not in dispute.

**9.** *American Steel Foundries v. Robertson*, 269 U.S. 372, 380, 46 S.Ct. 160, 70 L.Ed. 317 (1926); *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918); *Hanover Milling Co. v. Metcalf*, 240 U.S. 403, 413–14, 36 S.Ct. 357, 60 L.Ed. 713 (1916). In *Rectanus, supra* 248 U.S. at 97, 39 S.Ct. at 50, the Supreme Court stated:

> The law of trade-marks is but a part of the broader law of unfair competition; the right

to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; *and it is not the subject of property except in connection with an existing business.* [Emphasis added.]

**10.** This is not to say that certain eleemosynary organizations cou'd not also acquire rights in trade names. *See* 1 R. Callmann, *The Law of Unfair Competition Trademarks and Monopolies* § 1.1, at 5 (3d ed. 1969).

trademark use of the word on goods for the purpose of establishing priority of trademark use, a party must furnish evidence that, during the time period sought to be "tacked," it was a business entity and had engaged in sufficient activities to have acquired goodwill.

■ A review of the evidence persuades us that by January of 1968 defendant was a business entity possessed of goodwill, that it was making trade-name use of DYNAMET, and that this use continued until June 12, 1968, the claimed date of first trademark use of DYNAMET, and thereafter. By January of 1968, all of the necessary corporate organization formalities had been performed, *i. e.*, a prospectus had been prepared and distributed to potential investors, commitments for financial support from some twenty-three investors had been obtained, and the defendant had been incorporated under a name that included DYNAMET; a corporate office had been established;[11] Rossin had visited potential purchasers of defendant's products;[12] and other activities, each involving use of the corporate name, had been carried out—obtaining telephone service, checking account, checks, stationery, and business cards, ordering equipment necessary for manufacturing operations,[13] and offering products to be manufactured in the price list dated January 1, 1968. Some of these activities, considered together, might not be sufficient to enable a business entity to acquire the goodwill required for trade-name use. *See Steer Inn Systems, Inc. v. Laughner's Drive-In, Inc.*, 405 F.2d 1401, 56 CCPA 911, 160 USPQ 626 (1969) (a business office door sign, letterhead, and architectural drawings not sufficient to establish prior use of trade name); *Lawyers Title Insurance Co. v. Lawyers Title Insurance Corp., supra*, (mere incorporation not sufficient for trade-name use); 1 J. McCarthy, *supra* at § 16:4. However, we are satisfied that defendant's "package of activities" described above was sufficient.[14]

Since the earliest trade-name use alleged on appeal by plaintiff was February of 1968,[15] we hold that defendant possesses the superior rights in DYNAMET. It follows that the TTAB's refusal to grant a registration to plaintiff was correct.

Plaintiff repeats its argument before the TTAB that even if it does not possess superior rights in DYNAMET, defendant is not entitled to a trademark registration, because defendant's allegation of use is based upon the single shipment of June 12, 1968, and that this did not amount to use of the mark on goods in interstate commerce within the meaning of the Lanham Act.

■ We note that a trademark interference proceeding is not limited to the issue of priority of use, but extends to the issue of whether the prior user is entitled to register the mark. *Giant Food, Inc. v. Malone & Hyde, Inc.*, 522 F.2d 1386, 1393–94, 187 USPQ 374, 380 (Cust. & Pat.App.1975). Here the TTAB decided that defendant's application should be remanded to the examiner to determine the issue of registrabil-

---

**11.** The fact that the corporate headquarters as of early January of 1968 was located in Rossin's home is not material, particularly since the operations of the corporation were separately maintained.

**12.** Defendant's diligence in seeking purchasers of its products is further demonstrated by its January 25 appointment of F. H. Lenway Co. as its West Coast sales representative.

**13.** The ordering of equipment demonstrated not only the recognition of defendant by its suppliers, but also a commitment on defendant's part on which potential purchasers could rely for performance under the January 1 price list.

**14.** Appellant argues that proper *trade-name* use of a word requires that the owner have goods available for sale or, at least, be capable of manufacturing the goods. However, this argument rests on a failure to perceive the distinction between a trademark use and a trade-name use.

**15.** It is noted that the TTAB held that plaintiff's trade-name use of DYNAMET in connection with its activities during this month was sufficient to allow the time period commencing with February of 1968 to be tacked onto its subsequent first date of trademark use. In view of our decision, it is not necessary to consider the correctness of that holding.

ity of DYNAMET to defendant. As quoted earlier in this opinion, the TTAB said that "a serious question remains as to the bona fide character of the [June 12, 1968] shipment." Expressing no opinion on this point, we believe the case should be remanded to the TTAB.

In view of the foregoing, the decision of the TTAB awarding priority of use of DYNAMET to defendant is *affirmed*, and the case is *remanded* for further proceedings on the question of registrability of DYNAMET to defendant.

*AFFIRMED AND REMANDED.*

FORD, Judge, dissenting.

It is my view that, as between Dynamet Technology, Inc. (plaintiff) and Dynamet Incorporated (defendant), plaintiff has superior rights, *i. e.*, priority of use, in the term DYNAMET.

The TTAB found, 197 USPQ at 709, and defendant has not asserted otherwise, that on March 12, 1968, plaintiff delivered an order of processed powdered titanium to the Wyman-Gordon Company packed in a drum on which the name DYNAMET appeared along with the company address. Regardless of whether this is construed as a trademark or trade name usage, plaintiff can rely at least on this date for the purpose of priority.[1] *See Alfred Electronics v. Alford Manufacturing Co.*, 333 F.2d 912, 51 CCPA 1533, 142 USPQ 168 (1964); 1 J. T. McCarthy, *Trademarks and Unfair Competition* § 20:25, at 823–24 (1973); J. Gilson, *Trademark Protection and Practice* § 3.02[1], at 3–24 (1976). Moreover, for the purpose of determining priority, the fact that the shipment was in intrastate commerce is of no moment. *Bourns, Inc. v. International Resistance Co.*, 341 F.2d 146, 52 CCPA 962, 144 USPQ 424 (1965).

The majority, in affirming the award of priority to defendant, indicates that defendant was making trade name use of DY-NAMET from January of 1968, and that defendant can rely on this date for priority. I do not, for the reasons set forth *infra*, agree with this position.

The Supreme Court has recognized that trade names are protectable under the same common-law principles as are trademarks, *American Steel Foundries v. Robertson*, 269 U.S. 372, 380, 46 S.Ct. 160, 70 L.Ed. 317 (1926), and that trademarks are not the subject of property except in connection with an existing business.[2] *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918); *Hanover Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916). In *Rectanus, supra* 248 U.S. at 97, 39 S.Ct. at 50, the Court stated:

> The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; *and it is not the subject of property except in connection with an existing business.* [Emphasis added.]

On this record, it is my view that, as of March 12, 1968, the date on which plaintiff can rely for priority, defendant was not an existing business entity, *i. e.*, was not an *ongoing business. See* J. Gilson, *supra* § 3.02, at 3–17.

Defendant's Washington, Pennsylvania plant was leased in April 1968. Rossin testified that the equipment which was necessary to produce the products he contemplated manufacturing was ordered on December 18, 1967, and subsequently delivered and installed at the Washington, Pennsylvania plant. The TTAB found, 197 USPQ at 711, and defendant does not contend otherwise, that:

> After the defendant's plant was leased in April 1968 and employees hired, the

---

1. For reasons which will become apparent, I find it unnecessary to decide whether the TTAB was correct in its determination that plaintiff could also rely on February 1968, for priority.

2. This is not to say, as the majority correctly recognizes at note 10, that certain eleemosynary organizations could not also acquire rights.

equipment installed, and the raw materials purchased, services were rendered in converting materials other than its own and titanium and nickel mill products were made and shipped under the "DYNAMET" name or trademark.

While defendant introduced into evidence a price list dated January 1, 1968, at oral argument counsel for defendant, upon being asked from the bench when was the earliest date the items on the price list were manufactured, responded "probably a day or so" prior to the June 12, 1968, shipment (this was the shipment defendant relied upon for use in commerce). Considering the record as a whole, defendant, as of April 1968, had neither a product to sell nor the capability of producing a product or providing a conversion service (a service performed on material which a customer would supply); it merely had an intention to do business in the future. Therefore, any use it made of DYNAMET before this date cannot be relied upon for establishing priority. Accordingly, it has not established trademark or trade name use of DYNAMET sufficient for priority over plaintiff. *See United Drug Co. v. Theodore Rectanus Co., supra; Hanover Milling Co. v. Metcalf, supra; Steer Inn Systems, Inc. v. Laughner's Drive-In, Inc.,* 405 F.2d 1401, 56 CCPA 911, 160 USPQ 626 (1969); *Duff v. Kansas City Star Co.,* 299 F.2d 320, 132 USPQ 483 (8th Cir. 1962); *Modular Cinemas of America, Inc. v. Mini Cinemas Corp.,* 348 F.Supp. 578, 175 USPQ 355 (S.D.N.Y.1972); *Heinemann v. General Motors Corp.,* 342 F.Supp. 203, 173 USPQ 214 (N.D.Ill.1972); 1 J.T. McCarthy, *supra* § 16:4, at 572; J. Gilson, *supra* § 3.02, at 3–19; 3 R. Callmann, *The Law of Unfair Competition Trademarks and Monopolies* §§ 76.1, 76.2(d), at 272, 285 (3d. ed. 1969).

While recognizing that no property rights in a trademark can exist except in connection with an existing business entity, the majority indicates that no property rights in a trade name can exist except "in connection with its use with a business entity that has engaged in *sufficient activities* to have acquired goodwill, because a trade name is representative of the goodwill of a business entity." [Emphasis in original.][3] The activities of defendant which the majority finds to be "sufficient" are outlined as follows:

> [A] prospectus had been prepared and distributed to potential investors, commitments for financial support from some twenty-three investors had been obtained, and the defendant had been incorporated under a name that included DYNAMET; a corporate office had been established; Rossin had visited potential purchasers of defendant's products; and other activities, each involving use of the corporate name, had been carried out—obtaining telephone service, checking account, checks, stationery, and business cards, ordering equipment necessary for manufacturing operations, and offering products to be manufactured in the price list dated January 1, 1968. [Footnotes omitted.]

In the past, activities such as those enumerated above, have not been considered sufficient to establish a date of first use: utilization of a term in a prospectus—insufficient, *In re Holiday Mobil Home Resorts, Inc.,* 144 USPQ 510 (TTAB 1965); incorporation under a term—insufficient, *Lawyers Title Ins. Co. v. Lawyers Title Ins. Corp.,* 71 App.D.C. 120, 109 F.2d 35, 43 USPQ 166 (1939), *cert. denied,* 309 U.S. 684, 60 S.Ct. 806, 84 L.Ed. 1028, 45 USPQ 713 (1940); various uses of a term prior to opening for business, such as use on a business office door sign, letterheads, and architectural drawings—insufficient, *Steer Inn Systems, Inc. v. Laughner's*

---

**3.** The majority appears to find it significant that defendant is relying on trade name use of DYNAMET in contradistinction to trademark use. It is clear that *regardless* of whether a term is being used as a trade name, trademark or service mark, the basic underlying requirement that no property right in the term can be created except in connection with an existing business is the same. *Cf. American Steel Foundries v. Robertson, supra* 269 U.S. at 380, 46 S.Ct. 160. J. Gilson, *supra* § 3.07, at 3–17. While it is true that trade names are representative of goodwill, trademarks also symbolize goodwill. *See Hanover Milling Co. v. Metcalf, supra.*

*Drive-In, Inc., supra;* filing a certificate of incorporation, leasing of premises for a movie theater, advertising the impending opening, booking films for future presentation, and contracting with theater service agencies (such as concessionaires)—insufficient, *Modular Cinemas of America, Inc. v. Mini Cinemas Corp., supra.* While conceding that "[s]ome of these activities, considered together, might not be sufficient to enable a business entity to acquire the goodwill required for trade name use," the majority finds that when these same activities are viewed as a "package of activities," they are sufficient. I detect no substantive transformation by the mere denomination of these activities as a "package." Perceived individually or as a "package," in my view they are insufficient to evince an ongoing business, or using the majority's terminology, are insufficient to "enable a business entity to acquire the goodwill required for trade name use." These activities evince nothing more than an intention to do business in the future. Absent the presence of an ongoing business, there can be no goodwill for a trade name to represent.

Defendant argues that Sproat testified that at least as of December 18, 1967, he associated Rossin and the consulting services which were then being provided to Standard Pressed Steel Company with the name DYNAMET. While the majority apparently finds it unnecessary to reach this issue, it is not clear whether defendant is now asserting that during December 1967, Rossin, acting as DYNAMET, was in the business of providing consulting services. If this is defendant's position, neither the Sproat deposition, nor the record as a whole, supports it. Specifically, recalling his first meeting with Rossin, which was on September 29, 1967, Sproat testified as follows:

> To the best of my recollection, Mr. Rossin visited Standard Pressed Steel in my office and indicated that he had left the employment of Crucible Steel Company and was giving consideration to entering into a business. He requested information concerning Standard Pressed Steel's *practices and plans for purchasing of tita-*

*nium stock for the manufacture of fasteners.* [Emphasis added.]

Regarding the second meeting Rossin had with him, which was on December 12, 1967, Sproat testified that:

> The December 12 meeting, to the best of my recollection, included a report by Mr. Rossin of *his future plans to enter into business and supply the fastener industry with titanium stock.* [Emphasis added.]

When asked when did he first learn that Rossin's company was DYNAMET, Sproat responded:

> To the best of my recollection I learned of this in a telephone conversation prior to the December 12 meeting. The purpose of the telephone conversation was to agree to the meeting date of December 12 and also to communicate the fact that *Mr. Rossin had decided to go into business, furnishing fastener materials.* [Emphasis added.]

With respect to consulting services by Rossin, the Sproat testimony includes the following:

Q91 Was Mr. Rossin acting in a consulting capacity with you at that time?

A As a voluntary consultant.

Q92 And at least as of the date of December 18, 1967, when you received his letter Defendant's Exhibit SS, was Mr. Rossin acting as Dynamet?

A Yes, he was.

Q93 Did you associate the company which Mr. Rossin was putting together and the consulting services which he then was providing to you on a voluntary basis with the name Dynamet?

A Yes, I did.

Sproat then testified that he had no further contacts with Rossin until the spring of 1968 when Sproat visited defendant's facilities in Washington, Pennsylvania. When asked what was the purpose of this visit, Sproat testified:

> It was a preliminary review of the facility. It was also the intent of the visit to establish *a possible business relationship* between Standard Pressed Steel and

Dynamet, where we would either purchase material or purchase services from the Dynamet corporation. [Emphasis added.]

With respect to the purchases ultimately made, Sproat testified:

Q101 What kind of products does SPS purchase from Dynamet?

A There are two forms of our purchasing contracts with Dynamet. One has to do with service of cold drawing material which Standard Pressed Steel owns, and the other would be the outright purchase of material in the form of cold drawn bar or coil stock from Mr. Rossin or Dynamet.

Q102 *This is the same kind of purchase that you were talking about in 1967 and January of 1968, is that correct?*

A Yes. [Emphasis added.]

Notwithstanding Sproat's use of the term "consulting services," the Sproat deposition, read in its entirety, supports the conclusion that during December 1967, Rossin was attempting to cultivate a potential customer for defendant's future products and future conversion service. The gratuitous information given by Rossin was a natural part of the cultivating process.

Summarizing, since plaintiff can rely on at least March 12, 1968, for the purpose of priority, and since defendant was not an ongoing business as of that date, as between the parties, plaintiff possesses superior rights in the term DYNAMET. Therefore, I would reverse the decision of the TTAB.[4]

---

4. Since, in my view, plaintiff possesses superior rights in the term DYNAMET, I find no need to remand this case for a determination of the sufficiency of defendant's June 12, 1968, shipment.